IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **JUAN ENRIQUE CASTRO** | : | **No. 13-619-5** |

### MEMORANDUM

**Schiller, J.**                                                                                                                                                                            **September 9, 2014**

      Juan Enrique Castro, charged with conspiracy to distribute cocaine under 21 U.S.C. § 841 and 21 U.S.C. § 846, moves to suppress tangible evidence and statements arising from a stop of the automobile in which he was riding on October 10, 2013. Specifically, Castro argues that (1) the initial stop of the automobile was unlawful; (2) Castro's statements at the scene were obtained in violation of *Miranda*; (3) a key to co-defendant Sergio Rodriguez's Ford Fusion, found in Castro's pocket, was unlawfully seized; and (4) Castro's statements after being taken into custody were obtained in violation of *Miranda*. Castro further argues that the search of Sergio Rodriguez's apartment at 3300 Street Road in Bensalem was unlawful. The Court finds that the tangible evidence and statements arising from the October 10 automobile stop were not obtained in violation of the Fourth Amendment. However, for reasons discussed in the Court's Memorandum regarding Sergio Rodriguez's Motion to Suppress, the Court finds that the search of Rodriguez's apartment was unlawful. Therefore, Castro's motion is granted in part and denied in part.

### I.  BACKGROUND

      On October 8, 2013, Pennsylvania Bureau of Narcotics Investigation (BNI) agents arrested Jorge Martinez based on his alleged involvement in a multi-state drug trafficking

conspiracy. (Tr. of Hr'g on Defs.' Mot. to Suppress [Tr.] at 60.) Martinez began cooperating with law enforcement and revealed that he was a cocaine distributor for Alfredo Almeida-Urias. (*Id.* at 87.) Martinez told agents that he was in the process of collecting drug proceeds from Luis Gonzalez, and had been instructed to give the money to a truck driver for transportation to Almeida-Urias in Arizona. (*Id.* at 88-89.) Before being placed under arrest, Martinez granted BNI Agent Ivan Miranda consent to use his phone to arrange a meeting with the truck driver. (*Id.* at 89.) Miranda used Martinez's phone to contact the truck driver, later identified as Juan Monroy, and arrange a meeting on October 10 to transfer drug proceeds owed to Almeida-Urias. (*Id.* at 91, 93.) Monroy instructed Miranda, whom he believed to be Martinez, to pay the proceeds to "the old guy," later identified as Juan Enrique Castro. (*Id.* at 91.)

On October 10, Miranda arranged a meeting with Monroy in the parking lot of the Liberty Bell Diner on Frankford Avenue in Philadelphia. (*Id.* at 93.) When Miranda called Monroy's cell phone, Monroy indicated that "the old guy" was with him. (*Id.* at 94.) After their conversation, agents observed the driver of a black Nissan Altima hang up his phone. (*Id.* at 62.) Moments later, the Altima pulled into the parking lot. (*Id* at 94.) Eight agents converged on the car with guns drawn and ordered Monroy and Castro to exit the vehicle. (*Id.* at 73.) At that time, the agents did not tell them that they were under arrest. (*Id.*) After exiting the vehicle, Monroy initially denied being the person with whom Miranda had been communicating. (*Id.* at 95.) However, when Miranda dialed the number, the cell phone in the Altima began to ring, and Monroy admitted that he had expected to meet Martinez to pick up drug proceeds. (*Id.* at 95-96.)

At some point thereafter, BNI Agent Freddy Chaves patted down Monroy and began to question him. (*Id.* at 64, 74.) Monroy admitted to Chaves that he had picked up Castro near Michael's Diner on Street Road in Bensalem, and that they had come to the Liberty Bell Diner

intending to pick up drug proceeds from Martinez. (*Id.* at 64.) Chaves then proceeded to question Castro for approximately five minutes. (*Id.* at 75.) Castro stated that he did not know Monroy and had just asked him for a ride to lunch that morning. (*Id.* at 64-65.) When asked what he was doing in the Philadelphia area, Castro gave several inconsistent answers. (*Id.* at 65.) Agent Chaves then searched Castro. (*Id.* at 68.) While there were some inconsistencies within Agent Chaves' account of the search, he ultimately stated that he had reached into Castro's pocket and pulled out whatever he deemed to be important, including a key to a vehicle. (*Id.* at 78.) Agent Chaves later left the scene and proceeded to the area near Michael's Diner in Bensalem, where he located the vehicle to which the key belonged—a Ford Fusion registered to co-defendant Sergio Rodriguez. (*Id.* at 67.)

Castro was subsequently taken into custody at BNI headquarters. (*Id.* at 68.) Castro signed a waiver of his *Miranda* rights after an agent read them to him in Spanish, and then gave a statement to investigators. (Gov't's Mem. of Law in Resp. to Def. Castro's Mot. to Suppress Tangible Evidence Seized and Statements Taken [Gov't's Resp.] at 11.)

## II.     STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "Generally, subject only to a few well-defined exceptions, warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment." *United States v. Williams*, 413 F.3d 347, 351 (3d Cir. 2005). The defendant bears the burden of establishing that his Fourth Amendment rights were violated. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant establishes a basis for his motion,

however, the burden shifts to the government to show that the search or seizure was reasonable. *Id.*

### III. DISCUSSION

#### A. The Initial Stop of the Nissan Altima

The Government contends that the initial stop of Monroy and Castro's vehicle falls under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, a police officer may approach and briefly detain a person or vehicle in order to investigate possible criminal behavior. *Id.* at 22. A *Terry* stop is lawful under the Fourth Amendment when "the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The Fourth Amendment requires "at least a minimal level of objective justification" for the stop, but this standard is less demanding than the probable cause needed to arrest. *Id.*

Here, the agents were justified in stopping the Nissan Altima. Monroy had recently told Agent Miranda that he and "the old guy" were on their way to the Liberty Bell Diner and intended to pick up drug proceeds. Furthermore, when the conversation between Monroy and Agent Miranda ended, other agents witnessed Monroy hang up his cell phone. The Nissan Altima which Monroy was driving then pulled into the diner parking lot. Therefore, the Court finds that the agents had a reasonable suspicion that the occupants of the vehicle, Monroy and Castro, were engaged in criminal activity, and were thus justified in stopping the Nissan Altima.

#### B. Castro's Statements to Agent Chaves at the Scene

Castro's statements to the police during the stop are likewise admissible under *Terry* and its progeny. During a *Terry* stop, an officer may ask the detainee a moderate number of questions

to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). A traffic stop is not considered a "custodial interrogation" for purposes of *Miranda*. *Id.* at 440. This principle applies even if the police acquire probable cause to arrest soon thereafter. *See United States v. Diaz*, 444 F. App'x 551, 557 (3d Cir. 2011).

In this case, Agent Chaves testified that he questioned Castro for about five minutes in order to ascertain his identity, his relationship to Monroy, and his reasons for being in Philadelphia. Once Castro contradicted Monroy's statements and stated, rather implausibly, that he had just met Monroy that morning, Agent Chaves' suspicions were confirmed. Therefore, since Agent Chaves "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly," Chaves' initial, limited questioning of Castro did not require a *Miranda* warning. *United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988).

### C. The Seizure of the Key to the Ford Fusion

The parties agree that Castro was under arrest at the time Agent Chaves searched Castro's pockets and discovered the key to the Ford Fusion. (Def.'s Supplemental Mem. of Law in Support of His Mot. to Suppress Tangible Evidence Seized and Statements Taken [Def.'s Supplemental Mem.] at 15; Gov't's Supplemental Br. in Opp. to Defs.' Mots. to Suppress [Gov't's Supplemental Br.] at 5.) An initial *Terry* stop may ripen into an arrest once the police acquire additional information sufficient to establish probable cause. *See Diaz*, 444 F. App'x at 557. An arrest is lawful only if supported by probable cause, which is defined as "facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91(1964)).

Here, information acquired after the vehicle stop gave the agents probable cause to arrest Castro. When Agent Miranda dialed the phone number of the person with whom he had been communicating, the phone in the Altima rang. Monroy later implicated Castro as the person to whom the drug proceeds were to be paid. Furthermore, when questioned by Agent Chaves, Castro was unable "to give a plausible explanation for his whereabouts." *Diaz*, 444 F. App'x at 557. Under the circumstances, a reasonable person could have believed that Castro was involved in the drug trafficking conspiracy.

Consequently, the seizure of the key to the Ford Fusion from Castro's pocket was part of a search incident to a lawful arrest. When an arrest is made, law enforcement officers may search the arrestee's person and anything within his immediate control. *Chimel v. California*, 395 U.S. 752, 762-63 (1969). Therefore, since the key was on Castro's person, it was lawfully obtained pursuant to a search incident to arrest.

### D. Castro's Statements at BNI Headquarters

While Castro claims that he "did not understand his *Miranda* rights," his only argument in support of that claim is that "[he] is not fluent in the English language." (Def.'s Mot. to Suppress Tangible Evidence Seized and Statements Taken [Def.'s Mot.] at 3.) A defendant validly waives his *Miranda* rights if, under the totality of the circumstances, the waiver is made voluntarily, knowingly, and intelligently. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Here, there is no evidence that Castro's waiver was coerced, or that Castro did not comprehend his actions. Castro was read his *Miranda* rights in his native Spanish, and then signed a statement acknowledging his understanding of those rights before giving a statement to investigators. Therefore, the Court finds that Castro's waiver of his *Miranda* rights was voluntary, knowing, and intelligent.

### E. Search of Rodriguez's Residence

At the suppression hearing, this Court questioned the Government as to whether Castro had standing to challenge the search of Rodriguez's residence at 3300 Street Road, Apartment L1, Bensalem, and the following colloquy ensued:

THE COURT: Mr. Labrum - -

MR. LABRUM: Yes, Your Honor.

THE COURT: - - are you taking the position that Mr. Castro has no standing to object to the search warrant because he didn't live there? Or are you changing that?

MR. LABRUM: We changed that, Your Honor, based on the assertion for the first time here in Court that he lived there.

THE COURT: Okay.

MR. LABRUM: We haven't heard that before.

THE COURT: All right. So then he does have standing.

MR. LABRUM: Apparently so.

(Tr. at 20.) Therefore, the parties have agreed that Castro has standing to challenge the search of Rodriguez's residence. This Court has previously ruled that evidence seized from 3300 Street Road must be suppressed. That ruling applies to Castro. Therefore, Castro's Motion to Suppress is granted as to the evidence seized from the search of 3300 Street Road.

### IV. CONCLUSION

For the foregoing reasons, the Court holds that the tangible evidence and statements arising from the October 10, 2013 automobile stop were not obtained in violation of the Fourth Amendment. However, the Court holds that the search of Rodriguez's apartment was unlawful. Accordingly, Defendant's Motion to Suppress Tangible Evidence Seized and Statements Taken

is granted in part and denied in part. An Order consistent with this memorandum will be docketed separately.